Warren Wesley SUMMERLIN, Petitioner–Appellant,

v.

Terry L. STEWART, Director of Arizona Department of Corrections, Respondent–Appellee.

No. 98–99002.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2000

Filed Oct. 12, 2001

Ken Murray, Federal Public Defender's Office, Phoenix, Arizona, for the petitioner-appellant.

John Pressley Todd, Attorney General's Office, Phoenix, Arizona, for the respondent-appellee.

Before: KOZINSKI, TROTT, and THOMAS, Circuit Judges.

Opinion by Judge TROTT; Dissenting in Part by Judge KOZINSKI; Dissenting in Part by Judge THOMAS.

TROTT, Circuit Judge:

## I

### BACKGROUND [1]

On April 29, 1981, petitioner Warren Wesley Summerlin killed Brenna Bailey when she went to his residence on behalf of her employer to attempt to collect a delinquent debt. Summerlin bashed in Ms. Bailey's head and skull, probably with a hatchet, wrapped her partially nude body in a bedspread, and discarded her remains in the locked trunk of her car. He was arrested a few days later, charged, and convicted under Arizona law of first degree murder and sexual assault, and sentenced by Superior Court Judge Philip Marquardt to death pursuant to Arizona Revised Statutes ("A.R.S.") § 13–703 (1982). The judge based his sentencing decision on two

---

1. We note with regret that our disposition of this case has been delayed and hampered by a disorganized Appellant's Excerpts of Record filed in violation of Circuit Rule 30–1.5, requiring at the least rational consecutive pagination. Counsel shall escape sanctions for this glaring omission only because this court does not have the time to pursue them.

statutory grounds: (1) that the defendant had a prior felony conviction involving the use or threatened use of violence on another person, A.R.S. § 13–703(F)(2), *amended by* A.R.S. § 13–703(F)(2) (1993); and (2) that Summerlin committed the offense in an especially heinous, cruel, or depraved manner, A.R.S. § 13–703(F)(6). The Supreme Court of Arizona reviewed and affirmed his convictions and his sentence. *State v. Summerlin,* 138 Ariz. 426, 675 P.2d 686 (1983) (In Banc). After four unsuccessful post-conviction attempts in state court to overturn his conviction, he filed this petition for a writ of habeas corpus in the federal district court in Arizona. *See* 28 U.S.C. § 2254 (2000). The district court rejected the petition as amended, but, pursuant to Federal Rule of Appellate Procedure 22(b)(1), issued a certificate of probable cause enabling Summerlin to appeal. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to this case because Summerlin's petition was pending in district court prior to its enactment. *See Lopez v. Thompson,* 175 F.3d 1120, 1124 (9th Cir.1999). We have jurisdiction over his appeal pursuant to 28 U.S.C. §§ 1291, 2253, and 2254.

## II

### THE ISSUES

Summerlin raises six cognizable grounds on appeal: [2]

1. That his court-appointed public defender emerged from her one-night romantic relationship with the prosecutor with a fatal conflict of interest that adversely affected her representation of Summerlin at a critical stage of the proceedings;

2. That he was the victim of constitutionally deficient representation during the guilt phase of his trial by the attorney appointed to substitute for his public defender;

3. That he was the victim of constitutionally deficient representation in connection with the determination of his death sentence;

4. That the combined constitutional deficiencies of his trial attorney prejudiced his defense;

5. That the trial judge's alleged use of and addiction to marijuana during pre-trial, trial, and sentencing proceedings, as evidenced by the judge's admission of addiction and felony conviction in 1991 of a marijuana crime, deprived Summerlin of due process of law.

6. That the Arizona death penalty statute is unconstitutional in that it permits a judge rather than a jury to determine the elements necessary for a death sentence, in violation of the Supreme Court's recent decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

We conclude that only Summerlin's fifth claim regarding the trial judge has merit, and we reverse in this respect and remand for further proceedings as required by this opinion. As to his other claims, we affirm the judgment entered by the district court.

## III

### THE PLEA AGREEMENT AND THE CONFLICT OF INTEREST

#### A.

On November 17, 1981, Summerlin entered into a global plea agreement with the State known as an *Alford* plea. This arrangement enabled him without admitting

---

**2.** Summerlin's request to raise other issues not properly before us is denied.

guilt (1) to plead guilty to second degree murder and aggravated assault, and (2) to be sentenced accordingly. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The plea carried with it a stipulated sentence for the murder of Ms. Bailey of twenty-one years, of which he would be required to serve fourteen. The global agreement also called for Summerlin to plead guilty to aggravated assault in a different case with a maximum sentence of fifteen years. Furthermore, under the agreement Summerlin admitted to violating his probation in yet another case charging burglary. Finally, the agreement stipulated that Summerlin's sentences on the three charges would run concurrently.[3]

The hitch in this favorable agreement was that it was conditional. Judge David G. Derickson reserved the right to reject the provision for a stipulated sentence, in which case Summerlin could either (1) allow his plea to stand and be sentenced to a term of up to thirty-eight-and-one-half years, according to Judge Derickson's sole discretion, or (2) withdraw from his plea of guilty and have the matters proceed to trial and disposition.

At the time this plea was negotiated, Summerlin was represented by court-appointed Maricopa County public defender, Jane Roe.[4] Prosecuting the case for the State was John Doe, a Maricopa County prosecutor. On the day he entered it, Summerlin properly answered all the questions required to validate his *Alford* plea. He had second thoughts a few days later, however, and formally sent to the court a pro se motion to withdraw from his plea and to fire his public defender. In a court appearance on December 15, 1981,

scheduled to address his motion, Summerlin openly registered dissatisfaction with the plea, the stipulated sentence, and Jane Roe's handling of his case. As to the plea itself, Summerlin made his intentions crystal clear:

| The Court: | But you're saying you want to withdraw your plea of guilty? You want to withdraw your plea of guilty? |
|---|---|
| The Defendant: | Yes. Yes, sir. |
| The Court: | Do you understand that that would involve you going to trial on the original charges in this case and the probation violation? There aren't going to be any agreements between the State and the defense on what the sentence might be if you're convicted. Do you understand that? |
| The Defendant: | Yes, I understand that. |

After hearing his complaints, Judge Derickson denied Summerlin's motions, but took the occasion to inform Summerlin that it was his intention on the upcoming sentencing date of December 18, 1981, not to accept the stipulated sentence, and that therefore Summerlin would have the option either to withdraw from the plea, or to allow it to stand and be sentenced accordingly. Summerlin plainly understood the import of the judge's message, stating, "So, you're saying, on the 18th, if I want to withdraw from the plea agreement, I can? Is that what you're saying?" Jane Roe responded: "So, you can either go with what he gives you more than that or get out of the plea and go to trial."

Realizing that her client's intention to withdraw from the agreement would once again make him eligible for the death penalty, Jane Roe promptly attempted to have the case transferred to another judge who might look more favorably on the deal. On Friday, December 18, 1981, the presiding judge denied her forceful motion to

---

3. Mr. Summerlin was also charged in another case with possession of marijuana, a charge not at issue here.

4. We have substituted the familiar pseudonyms Jane Roe and John Doe for the real names of the public defender and prosecutor. After 20 years, their identities are irrelevant.

disqualify Judge Derickson on the ground of prejudice towards her client and allowed Judge Derickson to continue with the case.

That same evening, Jane Roe attended a Christmas party. She and prosecutor Doe left the party together and spent private time that night in what Doe later acknowledged under oath to have been an episode of "personal involvement . . . of a romantic nature." In a declaration dated October 12, 1984, prepared for state post-conviction proceedings, Jane Roe declared as follows: "I left [the Christmas party] with Mr. [Doe] and we spent time together that night, as a result of which I felt I could no longer ethically represent Mr. Summerlin."

The day after the Christmas Party, Jane Roe began to grapple with the implications of her relationship with the prosecutor arising from what she had done the night before. According to her testimony in state post-conviction proceedings, her frame of mind was that because of what had occurred between herself and Mr. Doe, she could no longer function as Summerlin's attorney. In her words, "I felt that I should get off this case," and "that it would be appropriate for another Public Defender to handle the case and take it to trial, since it looked like it might be a trial at that point, because Mr. Summerlin indicated he wanted a trial and Derickson had indicated he was going to reject the plea."

■ Before we continue our discussion of the content of the record on this issue, however, we must dispose of another matter: whether the district court properly excluded from the record relevant evidence. In support of his conflict of inter-est claim, Summerlin offered to the district court affidavits executed in 1995 by percipient fact witnesses to (1) the existence of Ms. Roe's conflict, and (2) the effect that the conflict had upon her. These witnesses were Ms. Roe's immediate supervisor in the Public Defender's Office, Bedford Douglass, Jr., and two co-workers, H. Allen Gerhardt and Charles Babbit. Summerlin offered also an affidavit from Judge Derickson explaining what he would have done at the December 22, 1981 plea-withdrawal hearing had he known of Ms. Roe's predicament.

In an Order dated July 18, 1996, the district court struck these patently relevant affidavits on the ground that they were not made a part of the state court post-conviction hearing during which the conflict of interest problem became an issue. With all respect to the district court, this ruling was erroneous. The lengthy record from the state court hearing held before Judge Marquardt demonstrates that the key conflict of interest question, i.e., whether the conflict adversely affected Ms. Roe's performance, was not squarely addressed and decided. In fact, Judge Marquardt did not articulate the proper test, as we explain in Part III B. of this opinion. Taking his lead from the argument of the State that Summerlin's *trial* suffered "no prejudice" from the pre-trial conflict of interest on the part of an attorney who then dropped out of the case,[5] Judge Marquardt held in his findings of fact as the sole predicate for his denial of Summerlin's claim that the "conduct of previous Counsel for the defendant and Counsel for the State did not prejudice the

---

5. The State's attorney said, "His basic issues were that there was misconduct of the previous attorneys. . . . And as far as that goes, the misconduct he's shown has absolutely no prejudice, no constitutional defect, no statutory defect at all. As a result of the alleged misconduct or conduct of the other counsel, two new attorneys were appointed on both sides. There's been no showing of prejudice, although he says that he got the death penalty because of it."

defendant." Such a finding was not precisely apposite, however, because the proper legal question was not whether the assumed conflict prejudiced Summerlin's trial, but whether it adversely affected the performance of Jane Roe.

 *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), entitles a habeas petitioner to offer in evidence relevant competent information regarding "the merits of [a] factual dispute [that] were not resolved in the state hearing." This rule is known as *Townsend's* "first circumstance;" and *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), notwithstanding, a preliminary showing of cause for the failure to resolve the factual dispute in state court and prejudice from that failure are not required in order to invoke in federal court the "first circumstance" rule. *Chacon v. Wood,* 36 F.3d 1459, 1465–66, n. 3 (9th Cir.1994), *superseded by statute on other grounds as recognized by Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000).

Hence, because Judge Marquardt did not resolve this central constitutional conflict of interest issue, we respectfully conclude that the disputed affidavits should have been allowed in evidence by the district court and considered prior to its ruling. Although the affidavits add little more than highlights and details to the record that was made in state court, they confirm Ms. Roe's testimony about her own state of mind and resulting behavior.

We go now to the evidence.

H. Allen Gerhardt was one of Ms. Roe's colleagues in the Public Defender's Office. During the time in question, she advised Mr. Gerhardt that "she had become romantically involved with the prosecutor on a pending death penalty case." Ms. Roe was concerned, said Gerhardt, about "the impact of her actions on her standing in the Public Defender's Office ... and was troubled by the intense gossip about the incident that was occurring within the Public Defender's Office." Ms. Roe and Gerhardt discussed "the possibility of [him] taking the case over in order to avoid revealing the conflict," but they dismissed this option as "not ... viable." Ms. Roe expressed similar concerns about the future of her job to another co-worker, Charles Babbit.

Her colleagues—she talked with five of them in all—agreed with her that she had to retire from the case, but disagreed that another public defender in their office could take her place. They believed that the entire Public Defender's Office should withdraw from the case, and that the Maricopa County Attorney's Office where Mr. Doe worked should turn the case over to the State Attorney General.

Ms. Roe's supervisor at the time of her romantic entanglement with Mr. Doe was Chief Assistant Maricopa County Public Defender, Bedford Douglass, Jr.. His November 22, 1995, affidavit about this affair says that in December 1981, Ms. Roe informed him that:

[S]he had become romantically involved with Deputy Maricopa County Attorney [John Doe], her opponent in a pending death penalty case. *Ms. [Roe] told me that her relationship with Mr. [Doe] created a conflict of interest and she requested permission to withdraw from the case.* I remember discussing the case with [Maricopa County Public Defender] Mr. Lee shortly after the conflict was revealed. Mr. Lee was very upset by Ms. [Roe's] having engaged in an affair with a prosecutor in a capital case which she was defending. It would have been clear to Ms. [Roe] that she probably faced adverse employment consequences as a result of her romantic

relationship with a prosecutor on a death penalty case.

(emphasis added).

Notwithstanding her belief that her behavior and "romantic involvement" with the prosecutor required that she depart from the case on the ground of a personal conflict of interest, Ms. Roe took no immediate steps to accomplish her withdrawal. Neither she nor her office informed either the court or their client of her conclusion that she could no longer be Summerlin's attorney. Instead, she accompanied him to and represented him at the pivotal hearing in Judge Derickson's court on December 22, 1981. Given Judge Derickson's clear signal on December 15, 1981, Summerlin was about to make a decision that would cause him to face capital punishment even though that possible punishment had previously been taken off the table.

At 9:00 a.m. on December 22, 1981, the new date for sentencing, Summerlin appeared again before Judge Derickson. The proceedings opened with Ms. Roe stating her appearance for her client. As promised a few days earlier, Judge Derickson advised Summerlin at the hearing of his decision not to be bound by the sentencing part of the plea agreement, and that if Summerlin allowed his pleas to stand, he was facing up to thirty-eight and one-half years in prison for the three offenses. After some confusion during which Summerlin—who is unable to read—told Judge Derickson on two occasions that he did not understand the Judge's explanation of the sentence he now might face, Ms. Roe privately conferred with her client. Their discussion ended with Ms. Roe's statement to the court, "I believe he understands, your Honor." Summerlin's immediate response was, "No, I don't understand," to which Ms. Roe replied, "Then what is your question?"

At this point, Summerlin asked about the number of years he might face on the three charges. Judge Derickson explained again the sentence Summerlin would face if he permitted his plea to stand. To this Summerlin said that he finally understood, adding, "Okay. I would like to withdraw from my plea agreement. Is that what you want me to say?" Judge Derickson appropriately told Summerlin that he did not "want" Summerlin to say that, he simply wanted to make sure that Summerlin understood what would happen if he permitted the plea to stand.

This exchange prompted another confidential discussion between Summerlin and Ms. Roe, followed by Summerlin's statement that, "It says, if this plea agreement should be changed in any way, I can withdraw." "Yes, that's the question he asked you," Ms. Roe replied. Summerlin then withdrew from the agreement. The court immediately reinstated his pleas of not guilty to the two consolidated cases, vacated its findings in the pending probation violation matter, and ordered that the matters be sent to the presiding judge for trial setting. Summerlin's courtroom decision to withdraw his plea made him eligible for a conviction of first degree murder and a sentence of death.

At this point in the hearing, Summerlin moved once again for new counsel. Ms. Roe remained silent. Judge Derickson denied his motion, stating that "the record may further reflect that you failed to establish any grounds upon which counsel should be changed." Judge Derickson, of course, was unaware of Ms. Roe's own determination that she no longer was fit to represent the client she had accompanied to court.

In an affidavit dated November 22, 1995, Judge Derickson averred that he did not know of the affair at the time of the withdrawal of the plea, and that

[h]ad I been made aware of the sexual relationship between Mr. Summerlin's attorney and the prosecutor in that case, I would have granted his request to change counsel. Furthermore, considering the circumstances, it would have been appropriate to continue the proceedings, rather than to proceed either with sentencing or rejection of a plea, to give time to Mr. Summerlin's new counsel to familiarize him or herself with the case.

On December 28, 1981, six days after Summerlin withdrew his plea, Ms. Roe finally broached the problem with Mr. Doe. On behalf of her client, she wanted Doe to stay on the case because he favored disposing of it with a lesser plea. He could discern no reason to step down as the prosecutor.

After his discussion with Ms. Roe about their predicament, John Doe arranged for a hearing on December 28, 1981, before another judge at which Ms. Roe planned to move to withdraw as counsel and to permit the rest of the Public Defender's Office to withdraw also. When she arrived for the hearing, Mr. Doe was already present. She had not advised her client of the reasons for the hearing or what she intended to do. The courtroom hearing began with the judge directly asking Mr. Summerlin if he wanted Ms. Roe removed from his case, and he said he did. To Ms. Roe's surprise, the judge granted the motion with no further inquiry and appointed George Klink, a private practitioner, as new counsel. The evidence suggests that the prosecution alerted the judge in an ex parte exchange of the purpose of the hearing. Given that she was off the case, Ms. Roe did not advise Summerlin of her conflict of interest because she saw "no reason to beat a dead horse." Summerlin continued to be unaware of the problem.

Ms. Roe eventually told Mr. Klink why she had to get off Summerlin's case, but she did not tell her ex-client. Neither did Mr. Klink. Mr. Klink wanted Mr. Doe to remain on the case notwithstanding the alleged impropriety because he believed that Mr. Doe was still inclined to engage in plea bargaining, but that a new prosecutor would not. Nevertheless, Summerlin at all times stood fast: he would not accept a plea bargain.

Approximately six weeks later, during the week immediately preceding February 19, 1982, the Arizona Attorney General's Office took over and prosecuted Summerlin's case on the ground of a conflict of interest between Doe and Ms. Roe. The Attorney General made it plain that the case would not be settled by way of a lesser plea, and Mr. Summerlin's cases went in succession to jury trial in Judge Philip Marquardt's court, first the aggravated assault case, and then the murder case. He suffered convictions on both. Sitting without a jury, Judge Marquardt then determined that Summerlin's sentence should be death.

The Public Defender reassigned Ms. Roe to the office's juvenile division, which a co-worker described as "an employment action widely regarded as a demotion within the office."

## B.

The Sixth Amendment entitles a criminal defendant to the effective assistance of counsel, unhindered by any conflicts of interest with her client. *See* U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). This right contemplates counsel who is in a position both professionally and personally to represent her client with undivided loyalty. *Wood v. Georgia*, 450 U.S.

261, 272–73, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Stoia v. United States,* 109 F.3d 392, 395 (7th Cir.1997). It extends not just to trials, but also to pretrial negotiations, such as the proceedings we examine in this case. *Holloway,* 435 U.S. at 490, 98 S.Ct. 1173; *Mannhalt v. Reed,* 847 F.2d 576 (9th Cir.1988) ("Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest.").

The American Bar Association Code of Professional Responsibility as it read prior to and during Summerlin's trial sheds clarifying light on this right in connection with this case:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

MODEL CODE OF PROF'L RESPONSIBILITY DR 5–101(A) (1982) ("Rule 5–101(A)").

The reason for this rule was well stated in ABA CPR Ethical Consideration 5–1:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

*See United States v. Hearst,* 638 F.2d 1190, 1197 (9th Cir.1980).

Although courts have identified conflicts of interest most often in cases involving representation of multiple clients, we have also applied the concept to other areas explicitly covered by Rule 5–101(A). For example, we concluded in *Hearst* that an attorney's book contract to write about his client's case created an actual personal and financial conflict of interest on the part of the lawyer; and we remanded for further explanation of the undeveloped facts. *Id.* at 1199. About the difference between a personal conflict and the multiple representation conflict in *Cuyler v. Sullivan,* Judge Choy said, "Sullivan's lawyer's conflict was based on multiple representation, whereas Hearst's was based on private financial interests. The differences are immaterial." *Id.* at 1193. Likewise, in *United States v. Hoffman,* 733 F.2d 596, 601–02 (9th Cir.1984), we held that the *Cuyler* test governed a conflict allegedly arising from counsel's desire to keep material adverse information about himself from the court. The reason behind our conclusion that such a situation constitutes a personal conflict of interest is "because the potential for diminished effectiveness in representation is so great." *Mannhalt,* 847 F.2d at 581.

■■ To secure relief based on a lawyer's conflict of interest, however, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler,* 446 U.S. at 348, 100 S.Ct. 1708. "An actual conflict exists if the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *Stoia,* 109 F.3d at 395 (internal citation omitted). "[E]xistence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." *Sanders v. Ratelle,* 21 F.3d 1446, 1452 (9th Cir.1994). Once an actual conflict is shown, a defendant need not establish prejudice, but he must demon-

strate that the conflict adversely affected the lawyer's representation of his client. *See Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708; *Hoffman,* 733 F.2d at 601; *Brown v. United States,* 665 F.2d 271, 272 (9th Cir. 1982).

■ The First Circuit has fashioned a useful two-part test for determining whether an actual conflict adversely affected counsel's performance. A defendant (or a petitioner) so claiming must demonstrate (1) that some plausible alternative defense strategy or tactic of sufficient substance to be a viable alternative might have been pursued; and (2) that this alternative was inherently in conflict with or not taken due to the attorney's other loyalties or interests. *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985); *Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993); *see also Burger v. Kemp,* 483 U.S. 776, 784–785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (rejecting conflict claim where "determining that there was an actual conflict of interest require[d] the attribution of [counsel's] motivation for not making the lesser culpability argument to the [alleged conflict]," when the record demonstrated that the argument was not viable).

■ Finally, "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Holloway,* 435 U.S. at 489, 98 S.Ct. 1173.

### C.

■ As with an ineffective assistance of counsel habeas claim based on *Strickland,* we need not decide whether an actual conflict of interest existed in this case if we are satisfied that even if it did, the conflict did not "adversely affect" Ms. Roe's representation of her client. *Strickland v.*

*Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Mett,* 65 F.3d 1531, 1534 (9th Cir.1995). Accordingly, and setting aside the question of whether the problematic relationship itself created a conflict of interest with her client, we assume here without deciding that Roe's frame of mind that she could "no longer ethically represent Mr. Summerlin" did amount to an actual personal conflict, and we move on to the dispositive second stage of the inquiry.

■ The task falling to a petitioner of demonstrating an adverse effect as a result of an actual conflict has been described as a "substantial hurdle." *Maiden v. Bunnell,* 35 F.3d 477, 481 (9th Cir.1994). "To overcome this hurdle, a petitioner must show that some effect on counsel's handling of particular aspects of the [case] was 'likely'," *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992), and that it "significantly worsen[ed] counsel's representations of the client." *Mett,* 65 F.3d at 1535.

An instructive example of how this inquiry works in the case of an alleged personal conflict of interest can be found in *Mett.* In that case, defense counsel had represented the prosecutor in an unrelated criminal case. Mett claimed that this fact alone might have caused his attorney to "go easy" on the prosecutor who, after all, had been his client. *Mett,* 65 F.3d at 1536. We held that such a general allegation—which is similar to the claim that Roe was disposed to go easy on Doe because of their personal relationship—was insufficient to establish an adverse effect, absent a specific showing that counsel's performance was inadequate. Similarly, in *Maiden,* 35 F.3d at 481–82, we assumed a personal conflict because defense counsel had prosecuted the defendant for an unrelated crime three years earlier, but after carefully examining the record for any

such evidence, we found an absence of adverse effect arising from that circumstance.

In this case, we have a very limited period to examine. Summerlin made it clear on December 15, 1981, that he wanted out of the plea agreement, and Judge Derickson signaled his intention not to accept the stipulated sentence on which the plea agreement depended. Jane Roe tried to salvage the favorable plea by attempting to disqualify Judge Derickson and to have the matter transferred to another judge. Her valiant gambit failed, and the liaison then occurred that created the assumed conflict. Four days later, she appeared in court with her client, and this is the critical event that we must examine in context to determine the existence of any adverse effect from what happened four days earlier between herself and Doe. We note (1) that Summerlin does not complain about anything that was said by Ms. Roe during their brief private discussions in open court on December 22, 1981; and (2) there is no evidence that Roe and Doe discussed the case during their nocturnal interlude or that Roe revealed any confidences.

Our examination of the record leaves us unable to find anything that Jane Roe might have done or failed to do during the withdrawal-of-plea hearing that was in any way linked to the supposed conflict, or that might have affected the course of the proceedings. The stark fact is that there was nothing that Jane Roe could have done. Judge Derickson had made it irrevocably clear just a few days earlier that he was going to reject the stipulated sentence, and Summerlin had made it equally clear that he was not going to stick with a plea that called for 38-1/2 years of incarceration. These dice were cast in stone, and they played out on the 22nd as the script had already been written on December 15,

1981, before any supposed conflict arose. Jane Roe had done her best for her client in negotiating a favorable life-saving plea, but Summerlin stubbornly rejected her advice and turned his back on both the plea and his attorney.

■ However, assuming again a personal conflict of interest, we do see a deficiency in Doe's professional conduct: the law required her promptly to report her predicament to Judge Derickson. Instead of discharging her clear professional obligation "to advise the court at once of the problem," *Holloway*, 435 U.S. at 485–86, 98 S.Ct. 1173, she remained silent on the issue and continued to represent Summerlin without first resolving her dilemma.

*State v. Davis*, 110 Ariz. 29, 514 P.2d 1025, 1027 (1973) (In Banc) (cited with approval in *Holloway*, 435 U.S. at 485, 98 S.Ct. 1173), dealt with a conflict of interest arising from representation of multiple defendants, but its message clearly applies to all conflicts of interest:

> An attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial. *He has an obligation to bring the fact of this conflict to the attention of the court at the earliest possible time after the conflict is discovered.* The trial court should give great weight to a representation by counsel that there is a conflict, particularly in the case where the counsel has been appointed by the court rather than retained by the defendants.

514 P.2d at 1027 (emphasis added).

The evidence in the record implies, and a reasonable person could rationally infer, that Ms. Roe's failure to notify the court of her problem as mandated by Arizona law and the Sixth Amendment was the direct

product of her conflicted state of mind. Manifestly, she did not desire to damage her own career any more than she already had. Instead of advising the court "at once" of her plight, *Holloway*, 435 U.S. at 485–86, 98 S.Ct. 1173, she failed to discharge this obligation. Had she promptly disclosed to Summerlin and to the court her situation, there is no doubt whatsoever—as Judge Derickson confirms in his affidavit—that she would have been removed from the case before the hearing, which would have been continued, and a new lawyer appointed.

 This regrettable slip on Jane Roe's part raises the question of whether the self-reporting lapse itself necessarily adversely affected her representation of Summerlin. On examination, we believe it did not. We take our lead in this regard from *United States v. Baker*, 256 F.3d 855 (9th Cir.2001).

Baker's defense lawyer had been charged with and pled guilty to a federal crime in another federal district, but failed to disclose that little fact to the district court in which he was appearing or to his client. The lawyer, in fact, was "actively seeking [in his case] to obtain a reduction of his own sentence by cooperating with the prosecution." *Id.* at 860. Defendant Baker subsequently argued that his lawyer had a conflict because he had reason to throw over his client in order to help his own case by currying favor with the Department of Justice. In rejecting this argument, we recognized in the strongest possible terms that the lawyer had violated his professional duty by failing to disclose this potential conflict to the court and his client: "Despite [the lawyer's] deplorably unprofessional conduct in advising neither his client nor the court of his own conviction and sentence, [defendant's] bare allegation suggests, at most, the *mere possibility* of conflict, not that counsel actively

represented conflicting interests." *Id.* at 860 (emphasis added).

It is evident from *Baker* that the simple failure timely to disclose a conflict and to ask to be removed cannot without more be itself the adverse effect under *Cuyler,* or else all conflicts would automatically result in adverse effects by virtue of the fact that the lawyer failed simply to disclose the conflict and ask to be removed. By this reasoning, the separate requirement of adverse effect announced by the Supreme Court in *Cuyler* and assiduously applied by our cases would be eliminated. Finding an actual conflict effectively would be the end of the inquiry. *See Hoffman,* 733 F.2d at 601–602 ("Despite the impropriety of [the lawyer's] failure to inform the court [of his suspension], as a matter of law we conclude that Hoffman was not denied his right to counsel because of a conflict of interest.").

Finally, it is patently demonstrable that Summerlin ultimately suffered no adverse effect from Roe's problem because any possible deficiencies in her performance were cured by her successor, George Klink. The fallout from the December 22 hearing was that Summerlin voluntarily withdrew his guilty plea, and so lost the opportunity to avoid a death sentence. But, according to Summerlin's new counsel, the Maricopa County Attorney's Office left the plea offer open, and new counsel approached Summerlin about changing his mind and re-entering the same plea. George Klink testified at the state court evidentiary hearing that he discussed the matter both with prosecutor John Doe and with his client, but Summerlin remained adamant about going to trial:

> Q. (By counsel for Summerlin) So you and the County Attorney engaged in plea bargaining after you got on the case?

940

A. (By Mr. Klink) Well, as I recall, [John Doe] indicated that an offer would remain open. I believe it was Mr. Summerlin's wish that no plea negotiations or no plea offers be accepted.

On cross examination, Klink made the same point:

Q. (By counsel for the State) Mr. Klink, early in your direct testimony you indicated something about a plea bargain was still open with the County Attorney. Do you recall that portion of your testimony?

A. (By Mr. Klink) Yes, I do.

Q. And, however, you said that the defendant was unwilling to enter any plea agreement?

A. That's correct.

Q. Was that something that he advised to you and said that he would not enter into any plea agreement?

A. That's correct. It was my view that the impedement (sic) to entering into a plea agreement was the defendant and not the state.

Q. And were you aware that there had been a previous plea agreement between the state and the defendant?

A. You mean when [Jane Roe] and [John Doe] were handling the case?

Q. Yes.

A. Yes, I was aware of that.

Q. And were you also aware that the defendant himself had filed pro per motions to withdraw from that plea agreement?

A. I was.

Q. So then you pick up the case afterwards and he still continued to be negative about any plea agreement?

A. Oh, yes, there is no question about that.

Q. And that didn't change when the case was transferred for prosecution to the Attorney General's Office?

A. No.

Thus, notwithstanding Judge Derickson's averment that had he known of Jane Roe's problem he would have continued the hearing, her participation in the withdrawal-of-plea hearing had no practical effect on Summerlin's situation. Despite Klink's entreaty, Summerlin remained determined to go to trial, and he got his wish. In this respect, the district court said, "Petitioner's claim in the [motion for a new trial] that there 'was a possibility that [Roe] could persuade him to reconsider withdrawing the plea or that other counsel may have been able to talk petitioner out of his desire to withdraw is simply speculation, unsupported by the record.' "

Our way here is illuminated by our decision in *United States v. Allen,* 831 F.2d 1487 (9th Cir.1987). In that matter, we concluded that the original defense lawyers had a conflict because they represented multiple defendants with conflicting interests. We found also an adverse effect because during the course of negotiating a global settlement, the conflicted lawyers generated a culpability list pursuant to which Allen would be punished more severely than other defendants who were arguably more culpable. Allen's interests were adversely affected, we held, because his lawyer's suggestion to the prosecutor that his culpability was greater than certain other defendants denied Allen a more favorable plea bargain: "No one should be represented by an attorney who is making him the 'fall guy' by design." *Id.* at 1497 (quoting *United States v. DeBerry,* 487 F.2d 448, 454 (2d Cir.1973) (alteration omitted)). After Allen refused the plea, however, the conflicted lawyers were replaced by unconflicted counsel. We held that this change of representation cured

the adverse effect because the new independent counsel "repeatedly suggested to Allen that he cooperate and reduce his liability, and that Allen adamantly refused," because he was "apparently more interested in complete exoneration than turning evidence against his fellow defendants." *Id.* Instead, he went to trial and got convicted.

*Allen* is on all fours with our case. The *only* arguable effect of Roe's supposed conflict here was that by not immediately retiring from the case, she allowed Summerlin to withdraw his plea without giving him unconflicted advice. But Roe was soon replaced by Klink, and Klink—like Allen's conflict-free lawyer—intervened and counseled him to no avail to accept the plea he had given up. On this point, the district court found that "[Summerlin] was unwilling to enter any plea agreement." This fact is clearly supported by the record. Given this scenario, neither any reluctance by the County Attorney to go forward with a plea that Summerlin did not want nor the Attorney General's withdrawal of it six weeks later is of any consequence. If refusal to accept the plea on the advice of independent counsel cured the adverse effect in *Allen,* Klink's advice and efforts must also have cured any possible adverse effect here. There is no material difference between the two cases.

Accordingly, although no one would condone Jane Roe's entanglement with the prosecutor, we conclude that Summerlin has fallen short of demonstrating that any personal conflict under which she may have been laboring serves as a reason to undo his conviction and sentence.

## IV

### EFFECTIVENESS OF REPRESENTATION

Summerlin claims he was denied the effective assistance of counsel at all stages of his trial proceedings, in violation of the Sixth Amendment as interpreted in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He argues that his trial lawyer, George Klink, failed adequately to investigate and to present his "only viable defense": that Summerlin had an organic brain dysfunction and an "impaired ability to premeditate or to exercise self-control." He argues also that had counsel done his job properly, he would have discovered and then used on his behalf the following:

1. Evidence from Summerlin's family relating to his mental condition, history of severe physical abuse and mistreatment during childhood, electroshock therapy, the forced inhalation of ammonia fumes, and juvenile history—including the fact that he was once hit by a bus.

2. Summerlin's records from schools, camps, and friends regarding physical abuse and juvenile detention.

3. Prior records from the state of Florida and the U.S. Government, and information from his parole officer.

4. Information pertaining to his two marriages from his wives about psychological and sexual problems.

5. Information about his alleged various head injuries.

Summerlin claims that this trove of information could have been introduced in evidence both to defend against the charge of first degree murder and the death penalty. The district court examined this multi-part issue in considerable detail and concluded that it had no merit. We agree not only with the district court's conclusions, but with the manner in which it carefully analyzed the record. Because we cannot improve on the court's analysis and explanation, we respectfully republish in large measure its analysis as our own, but

without the customary method of specific attribution.

## A.

### PSYCHIATRIC DEFENSES

In June 1981, prior to Mr. Klink's assignment as defense counsel, Summerlin was examined by two court-appointed psychiatrists, Drs. Maier Tuchler and Otto Bendheim, pursuant to Rule 11 of the Arizona Rules of Criminal Procedure. *See* Ariz. R.Crim. P. 11. Each found him competent to stand trial and legally sane under the *M'Naghten* standard. Although there was no evidence of mental disease or defect, Dr. Tuchler observed that dyslexia and illiteracy made Summerlin "functionally mentally retarded." He further found that Summerlin's impulse control was extremely impaired due to an explosive-type personality disorder and that he had an anti-social personality.

Around this same time, Dr. Leonardo Garcia–Bunuel, a psychiatrist who treated Summerlin at the Maricopa County Jail, contacted defense counsel Ms. Roe regarding a possible diagnosis of psychomotor epilepsy. Summerlin had described to Dr. Garcia–Bunuel details of the murder, particularly experiencing an intense perfume odor, and this led Dr. Garcia–Bunuel to suspect that he may have had a temporal lobe seizure at the time of the killing. Subsequently, in August 1981, Ms. Roe arranged for neurological testing by Dr. Mark Winegard. An electroencephalogram (EEG) showed some slowing in Summerlin's posterior temporal area, but was insufficient to support a diagnosis of epilepsy. CAT scans and a second EEG performed in October 1981 were normal. As a result, Dr. Garcia–Bunuel withdrew his concerns.

Ms. Roe secured also a psychological evaluation of Summerlin from Dr. Donald Tatro in November 1981. Although concluding there was no evidence to support an insanity defense, Dr. Tatro found indications of organic brain impairment, borderline personality disorder, and paranoid personality disorder. In his opinion, Summerlin "is deeply emotionally and mentally disturbed, unaware of the motives underlying much of his behavior, and unable, because of his problems, to exercise normal restraint and control, once his highly unstable and volatile emotions are aroused."

█ Summerlin argues that Mr. Klink's representation during trial was constitutionally deficient because he failed independently to investigate potential psychiatric defenses and failed to follow up on, or utilize, psychiatric evidence already available to him. According to Summerlin, once Drs. Tuchler, Bendheim, and Tatro reported that Summerlin was legally sane, Mr. Klink "never really considered mounting a 'state of mind' diminished capacity defense at trial in order to reduce the level of offense by negating *mens rea* . . . ." Specifically, he says Mr. Klink should have presented evidence of (1) psychomotor epilepsy and (2) his impulsive personality to show in the guilt phase of the trial that the killing was not premeditated. We note parenthetically that because Arizona has long rejected the affirmative defense of diminished capacity, *see State v. Mott,* 187 Ariz. 536, 931 P.2d 1046, 1050–51 (1997) (In Banc), Summerlin could not have offered during the guilt phase of his trial evidence of a mental disease or defect to show that he was incapable of forming a requisite mental state for the charged offense.

## B.

### PSYCHOMOTOR EPILEPSY

█ Before she developed a conflict of interest, Ms. Roe thoroughly investigated

Dr. Garcia–Bunuel's suspicion of epilepsy. She obtained neurological testing and pursued this possible diagnosis with Dr. Bendheim, as revealed in the following letter the doctor sent to Judge Derickson in December 1981:

> We again discussed the possibility of psychomotor epilepsy, especially in view of Dr. Garcia–Bunuel's findings that this man had very vivid olfactory (smell) hallucinations preceding outbursts. I went over this whole situation again and told Miss [Roe] that the neurologists have been unable to find psychomotor epilepsy, although there was some slowing of the wave patterns in the temporal lobes, where psychomotor epileptic attacks usually originate.

> While a positive electroencephalogram, which was not obtained here, would make a positive diagnosis, an essentially negative EEG does not entirely rule out the possibility of epileptic-type seizures, and for this reason I see absolutely no harm and potentially quite a bit of benefit to place this defendant on anti-epileptic, anti-seizure type medication, even though the diagnosis has not been established.

During post-conviction hearings, Ms. Roe testified that she met with trial counsel Mr. Klink on two or three occasions and spent a number of hours discussing her pre-conflict of interest investigative efforts, including a possible insanity defense. She stated that she discussed this aspect of the case with Mr. Klink "in depth," including the examinations and conclusions of all five doctors. Mr. Klink testified that after consulting with Ms. Roe, he made a tactical decision to not pursue an insanity defense due to the lack of evidence. As for the possible diagnosis of psychomotor epilepsy, Mr. Klink did not follow up on Dr. Garcia–Bunuel's earlier suspicion because the doctor had changed his opinion

and was out of the country at the time of trial. Instead, Mr. Klink made a decision to defend his client by arguing that the facts and circumstances of the prosecution's case did not support a verdict of first-degree murder. Summerlin himself desired this fact-based defense.

██ In assessing an attorney's performance, a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Having reviewed the entirety of the record, we conclude—as did the district court—that Mr. Klink's performance was reasonable under the circumstances. In deciding whether to pursue evidence of Summerlin's mental state, Mr. Klink was entitled to rely on the opinions of the mental health experts who had already examined Summerlin. *See Hendricks v. Calderon,* 70 F.3d 1032, 1038 (9th Cir.1995). At the time, none of the doctors, including Dr. Garcia–Bunuel, was able to positively diagnose Summerlin as suffering from psychomotor epilepsy. It was thus reasonable for Mr. Klink not to investigate this possibility further. Likewise, in view of the doctors' inability to make a diagnosis, Mr. Klink's tactical decision to forgo presenting what little evidence he had of epilepsy was certainly within the "wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052; *see Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir. 1991) ("It is also acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion.").

## C.

## IMPULSIVITY

 At trial, counsel's main defense theory was lack of premeditation. Mr. Klink argued to the jury that the killing may have been the result of a "violent, sudden reaction" to Brenna Bailey's visit to collect on an overdue bill. Yet, he presented no evidence to support this theory, despite having the reports of Drs. Tuchler and Tatro which described Summerlin's impulsive personality, reports which would have been admissible under *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580, 582–83 (1981) (In Banc); *Vickers v. Ricketts,* 798 F.2d 369, 372 (9th Cir.1986) ("The Arizona Supreme Court has held that the tendency to act on impulse is probative of an absence of premeditation.") (citing *Christensen,* 628 P.2d at 582–83). At the evidentiary hearing in state court, Mr. Klink was not asked why he failed to present this evidence or whether he was even cognizant of the *Christensen* decision, which had been handed down more than a year before Summerlin's trial. Nonetheless, even assuming for the sake of argument that Mr. Klink's representation in this regard was deficient, Summerlin has failed to establish prejudice.

The trial court instructed the jury on both first and second degree murder and explained that a finding of premeditation differentiated the former from the latter. "To prove premeditation, the state was required to show only that [the defendant] had had time to reflect after forming the intent to kill; any length of time would have been sufficient, even if it was 'as instantaneous as [the time] it takes to form successive thoughts in the mind.'" *Clabourne v. Lewis,* 64 F.3d 1373, 1380 (9th Cir.1995) (citing *State v. Neal,* 143 Ariz. 93, 692 P.2d 272, 276 (1984) (In Banc)). In its closing argument, the State asserted that evidence of sexual assault established pre-

meditation because Summerlin would have had to get up after assaulting the victim to retrieve the hard, blunt object then used to fracture her skull. The prosecutor also emphasized that the numerous blows to the victim's head showed that Summerlin had had time to reflect on his actions.

After carefully reviewing the record, the district court concluded that there is no reasonable probability the jury would have acquitted Summerlin of first degree murder had Mr. Klink introduced evidence of Summerlin's impulsive personality. *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). We agree. The doctors would not have been allowed to testify that Summerlin was in fact acting impulsively at the time of the murder. The testimony would have been limited to a general description of Summerlin's behavioral tendencies and thus would have had only marginal probative value in determining whether Summerlin lacked premeditation at the time of the offense. *See Christensen,* 628 P.2d at 583–84. In addition, the State presented considerable evidence of sexual assault, and the jury found Summerlin guilty on that charge. Furthermore, uncontroverted testimony established that the victim had been hit repeatedly and forcefully on different sides of her head. Summerlin's "excessive and purposeful actions demonstrate more than just a 'reactionary' homicide." *State v. Summerlin,* 675 P.2d at 694; *cf. State v. Lopez,* 158 Ariz. 258, 762 P.2d 545, 550 (1988) (In Banc) (holding that nature, severity, and placement of injuries, several of which would have individually caused death, demonstrated premeditation); *State v. Sellers,* 106 Ariz. 315, 475 P.2d 722, 723 (1970) (In Banc) (same).

## D.

## THE PENALTY PHASE

■ Although a defense of diminished capacity may not be used during the guilt phase of a murder trial to defeat a required mental state, proof of diminished capacity is admissible in Arizona as a mitigating circumstance for sentencing. *See* A.R.S. 13–703(G)(1). In this respect, Summerlin complains that the information referred to in the previous section of this opinion was underdeveloped by his lawyer during the sentencing phase and could have been used to defend against the State's attempt to have him sentenced to death.

The first problem we encounter with this claim is that Summerlin himself restricted and limited his own defense at the aggravation/mitigation pre-sentencing hearing. Although counsel is in charge of the legal aspects of a defense, we do not believe that he may not be influenced in this respect by the wishes of his client, especially when the issue is whether counsel's representation was deficient. This is what occurred when George Klink attempted to call Dr. Tatro as a mitigation witness on behalf of his client:

> THE COURT: All right. Come forward and be sworn, please. Your client wants to ask a question.
>
> MR. KLINK: Well, your honor, may we approach the bench?
>
> THE COURT: All right.
>
> (An off the record discussion at the bench ensued, outside the hearing of the court reporter.)
>
> THE COURT: At the request of defense counsel and his client, *the client would like to have a couple of minutes to talk over the calling of this witness.*
>
> . . . .

> MR. KLINK: All right, your honor. With the consent of the defendant, the defendant has no witnesses in mitigation at this time and—
>
> THE COURT: This will be—
>
> MR. KLINK:—and we'll rest.
>
> . . . .
>
> MS. GIFFORD (The Prosecutor): Your honor, it's my understanding—at least my impression—that this is the defendant's decision that he does not wish certain witnesses to be called. Could we have that reflected on the record, perhaps, because—
>
> THE COURT: I think it has been, and Mr. Summerlin, I'll address you directly, to make sure that—for any error that might possibly be claimed at this time— to make sure that you understand that you are facing a potential decision between either life imprisonment or the death penalty, and this is the time in which you must decide whether you present any mitigation witnesses on your behalf.
>
> This is your entitlement. *Your lawyer has told me that at this time you do not wish to, and he is telling me that you do not wish to call any mitigation witnesses.* If this is correct I'll accept your decision.
>
> But I want it to be very clear that this is the time, and only time, that you'll be able to have to do this.
>
> So you don't even need to respond to me. You understand what I'm telling you?
>
> THE DEFENDANT: Yes.

(emphasis added).

Mr. Klink then outlined for Judge Marquardt the evidence on which he planned to rely on behalf of his client: a video tape of Summerlin, the extensive presentence investigation report prepared by the deputy probation officer, and Dr. Tatro's re-

dacted psychiatric report. Moreover, as Mr. Klink explained at the post-conviction hearing, he planned to capitalize on aspects of the prosecution's two psychiatric witnesses' testimony to emphasize mitigating aspects stemming from his client's serious personality disorders, i.e., Summerlin's propensity to fly into a rage with minimal provocation and then to lose control over his behavior. This is how Mr. Klink explained his strategy to the trial court:

> THE COURT: Again, my question to you, after you've talked to your client—do you have—is it still your decision—and it's strictly your decision—whether to call witnesses or not?
>
> MR. KLINK: Yes, your honor. We have noted in the presentence report Dr. Tatro's evaluation of the defendant is included and attached thereto. And therefore, in consulting with the defendant, we have decided, and I believe that is his decision, as well as mine, in consultation with him, to rely on the report that has been—the evaluation of Dr. Tatro that has been attached to the presentence report.
>
> THE COURT: I have that available, and have spent quite a bit of time with that.

An examination of the Presentence Investigation Report on which Mr. Klink relied as evidence reveals considerable information in possible mitigation of Summerlin's behavior. Summerlin's wife described him as a man with a "quick and severe temper" prone to violent rages when feeling threatened or pressured. Moreover the report chronicles in great detail Summerlin's placement for incorrigibility in the Florida State School for Boys, as well as his extensive adult criminal record. Under Social History, the report recreates the relevant part of Summerlin's life, including the following:

1) His father's lengthy incarceration during Summerlin's childhood for armed robbery; as well as the fact that his father was shot to death in another armed robbery.

2) His parent's troubled divorce.

3) His mother's alcoholism and lack of training and guidance for her son.

4) His mother's wanton behavior with a series of men.

5) The fact that his mother beat him so severely and consistently that he preferred juvenile detention to home.

6) His illiteracy and dyslexia, and his lack of secondary education.

7) His two failed marriages.

8) His neck and back injuries sustained in an automobile accident.

9) His profound neurotic hostility against women.

10) The effect of his upbringing on his antisocial behavior.

Dr. Tatro's detailed report is also quite penetrating and revealing in presenting a sexually sterile Summerlin as a damaged victim of his childhood with resulting serious personality disorders beyond his control. Furthermore, Dr. Tatro administered psychological tests to Summerlin that indicated (1) the presence of organic brain dysfunction consistent with his history of impulsive overreacting, and (2) severe, deep-seated personality conflicts going back to his early childhood that explained his behavior, functional paranoia, and "organically diminished capacity for self-control."

Dr. Tatro summed up his findings with this concluding information:

> Although his paranoid attitudes and emotions are plentiful, there was nothing he said or reported to indicate that they have ever reached delusional proportions. He spoke of no plots, or bi-

zarre happenings. While he certainly feels persecuted, subjected to critical scrutiny, and subject to various malignant influences, he retains a basically logical attitude about these feelings, and is able to question their validity and to regard them as possible, even probably, unwarranted in many instances.

His defective sense of identity, extreme ambivalence, great emotional [undecipherable], explosive rages, and inability to enter into enduring trusting relationships, all in the absence of any of the more usual symptoms of psychosis, such as delusion, hallucination, and disorganized thinking, are consistent with a diagnosis of *Borderline personality disorder* (DSM III, 381, 83). The Borderline personality disorder is described as being marked by a profound identity disturbance, great inability in a variety of areas of functioning, such as interpersonal relations, mood, and behavioral reactions, which frequently take the form of intense anger, either directed against others or towards ·one self, or both. Great impulsivity and unpredictability is one of the hallmarks of this disorder. In addition, to this primary diagnostic pattern, there are also features associated with a *Paranoid personality disorder*, and indications of an organic brain impairment, which is probably responsible for the defendant's developmental reading disorder, and which may very well underlie some of the difficulty he has with keeping his impulses under control.

In my opinion, while Mr. Summerlin's mental condition does not support an argument of legal insanity under the McNaughten Rule, because he is deeply emotionally and mentally disturbed, unaware of the motives underlying much of his behavior, and unable, because of his problems to exercise normal restraint and control, once his highly unstable and volatile emotions are aroused, it should be taken into consideration as a mitigating factor.

(emphasis in original).

When we compare the information presented by Mr. Klink to Judge Marquardt at the aggravation/mitigation hearing with · what his lawyers now say should have been made part of the record, we find little difference. In the main, everything needed to support Mr. Klink's argument for life—that the killing was committed not with deliberation, but impulsively as the result of disorders brought about by a seriously flawed childhood—was placed on the record and brought to Judge Marquardt's attention. Although the information most probably could not have defeated the State's claim of premeditation during the guilt phase, it was the best Mr. Klink could muster in mitigation of this homicide. Granted, some of the details of his childhood such as electroshock treatments were left out, but we cannot say that the addition of these details would have made a difference.

■■■■ In assessing the reasonableness of Klink's decision not to call Dr. Tatro to testify, we are mindful that this appears from the hearing transcript to have been influenced by Summerlin's wishes. While certain fundamental decisions must be left to the client, *see Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the general rule is that an attorney retains control over tactical and strategic decisions. *See New York v. Hill*, 528 U.S. 110, 114–15, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000); Model Rules of Prof'l Conduct R. 1.2 cmt. 1. But, despite the wide latitude afforded counsel over tactical and strategic decisions, these decisions must be made after consultation with the client. Model Rules of Prof'l Conduct R. 1.2 cmt. 1; Defense Function Standard 4–5.2. This consultation requirement would be meaningless if counsel were unable to take his client's wishes into account when

making tactical decisions. Courts, in assessing the reasonableness of a particular action, must therefore view that action against the backdrop of client wishes. Indeed, any approach that reviewed an attorney's actions solely in the abstract might well encourage attorneys to make tactical decisions on their own, thereby compelling clients to resort to drastic measures-such as asserting their *Faretta* right to proceed without legal representation-just to have their wishes taken into account. *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). We believe that when the competence of a lawyer's tactical or strategic decision is being reviewed, the lawyer is entitled to an additional measure of deference if he acts in conformity with the client's wishes. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); *Gerlaugh v. Stewart*, 129 F.3d 1027 (9th Cir.1997).

Under the circumstances, we conclude that Mr. Klink's performance during the penalty phase measured up to that required by the Sixth Amendment and that Summerlin has failed to show that he was prejudiced by any shortcomings.

## V

### *JUDICIAL IMPAIRMENT CAUSED BY THE USE OF MARIJUANA*
He who the sword of heaven will bear
should be as holy as severe

WILLIAM SHAKESPEARE,
MEASURE FOR MEASURE act 3, sc. 2

#### A.

In *Jordan v. Massachusetts*, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912), a defendant convicted of murder and sentenced to death asked the Supreme Court to decide whether the resolution by the state courts of his claim that a juror was insane during his criminal trial satisfied the due process commands of the Fourteenth Amendment. In answering that question in the affirmative, the Court held as a constitutional predicate to its conclusion that "[d]ue process implies a tribunal both impartial and *mentally competent* to afford a hearing." *Jordan*, 225 U.S. at 176, 32 S.Ct. 651 (emphasis added). In support of its opinion in favor of the State, the Supreme Court relied on the fact that an evidentiary hearing had been conducted on the issue of the juror's alleged impairment and a ruling made on the sufficient mental capacity of the juror during the entire trial. *Id.* at 173, 32 S.Ct. 651. On that basis, the Court concluded that the process afforded in the state court to the defendant to air this issue was constitutionally acceptable because it gave him the requisite "opportunity for a hearing." *Id.* at 176, 32 S.Ct. 651.

In 1987, a similar issue involving the mental condition of jurors came to the attention of the Court in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). The question posed was whether the district court erred by refusing to admit juror testimony at a post-verdict hearing on juror drug and alcohol intoxication during the trial. *Tanner*, 483 U.S. at 110, 107 S.Ct. 2739. Although the *Tanner* Court held that Federal Rule of Evidence 606(b)[6] precludes the use of juror testimony on this issue, the court reaffirmed the due process entitlement of a defendant in a criminal case to a mentally competent tribunal as articulated

---

6. Federal Rule of Evidence 606(b) states:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of

in *Jordan,* and confirmed the availability of the device of an evidentiary hearing to vindicate this fundamental right in the context of a claim involving mind-altering substances. *Id.* at 126–27, 107 S.Ct. 2739. The Court cited with approval *United States v. Taliaferro,* 558 F.2d 724, 725–26 (4th Cir.1977), wherein the trial court (1) conducted a hearing to determine whether jurors were intoxicated during deliberations, (2) considered records of a club where the jurors dined, and (3) took the testimony of a marshal who accompanied them. *Id.* at 127, 107 S.Ct. 2739. The Court observed in connection with Tanner's Sixth Amendment right to an unimpaired jury that this interest is protected by several aspects of the trial process, including that "during the trial the jury is observable by the court, by counsel, and by court personnel." *Id.*

### B.

In the case before us, the judge who presided over Summerlin's trial in 1982, and who then determined by himself over a weekend that Summerlin should be executed, pleaded guilty in 1991 in Arizona to a felony involving a conspiracy to possess marijuana and admitted to suffering from an addiction to the drug. This was Judge Marquardt's second conviction involving the use of marijuana. From the facts and circumstances of this predicate, Summerlin argues that he may have been denied due process of law because of the judge's involvement with mind-altering drugs during his trial.

In support of his allegations against Judge Marquardt, Summerlin submitted to the district court an official report from the Phoenix Police Department dated June 3, 1991. The report details a purchase of marijuana by Judge Marquardt from Barbara Moffett in May of 1991, which was intercepted from the United States mail by the police. When the delivery went awry, the report states that Judge Marquardt called Barbara Moffett to see if she had spoken to the authorities about the purchase, and when she told him she had not, Judge Marquardt told her that everything would "work out okay" because his daughter Tiffany's boyfriend Butch "was going to take the rap for the marijuana."

The official police report also states that Barbara Moffett told Phoenix police in 1991 on the basis of first-hand knowledge that Judge Marquardt "was a frequent user of marijuana, had been when she met him [sixteen years earlier], and has continued to be so since." It also appears from this police report that the envelope in which Judge Marquardt sent a cashier's check to Ms. Moffett for the marijuana carried the printed official heading, "Philip Marquardt, Superior Court Judge, Phoenix, Arizona."

Moreover, Judge Marquardt was convicted in 1988 in Texas of misdemeanor possession of marijuana which was found on his person at the port of entry in Houston. *In the Matter of Philip W. Mar-*

---

a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

*quardt*, 161 Ariz. 206, 778 P.2d 241, 242–43 (1989) (In Banc). His apparently false explanation documented in that case was that a stranger gave him the marijuana wrapped in a small piece of plastic that he stuck in his watch pocket. *Id.* at 242. For that offense, the Supreme Court of Arizona suspended him from his judicial position without pay for one year from September 2, 1988, through September 2, 1989, a sanction considered by that court to be more severe than a mere censure or reprimand. *Id.* at 250. We cannot fail to note that this serious and career-threatening incident was not sufficient to convince Judge Marquardt in 1989 to cease his illegal behavior, arguably because his addiction was stronger than his good sense or self-control. Eventually, Judge Marquardt stepped down from the bench and was ordered disbarred in Arizona and by the United States Supreme Court after the 1991 incident came to light. *See In the Matter of Disbarment of Philip Walter Marquardt*, 503 U.S. 902, 112 S.Ct. 1256, 117 L.Ed.2d 486 (1992).

Summerlin thus contends that (1) the evidence of Judge Marquardt's use of and addiction to marijuana is very compelling, (2) Judge Marquardt's drug use began no later than 1975, and (3) that it was in full bloom during his trial and sentence to death in 1982. Respondent Stewart does not question Summerlin's factual allegations against Judge Marquardt. To quote the State's candid brief filed with this court: "There is no dispute that Judge Marquardt used marijuana during the 1980s." The district court noted that "Respondents concede that Judge Marquardt used marijuana during the relevant time period."

Having made this uncontested showing in district court, Summerlin requested funds to investigate the nature and extent of Judge Marquardt's drug usage. On September 27, 1995, the district court denied this request, as well as Summerlin's follow-up request for an evidentiary hearing to develop the facts in support of his claim. Summerlin now asserts that the district court erred in its handling of this issue and asks us to reverse and remand for a new trial, or for further proceedings.

## C.

■ We conclude from *Jordan's* and *Tanner's* articulations of a defendant's right to a mentally competent tribunal that Summerlin had a clearly established constitutional right in 1982 to have his trial presided over, and his sentence of life or death determined by, a judge who was not acting at that time under the influence of, or materially impaired by, a mind-altering illegal substance such as marijuana. *See* 28 U.S.C. § 2254(d)(1). Our conclusion regarding this aspect of a "mentally competent tribunal" is especially appropriate in a jurisdiction such as Arizona where in a capital case, the trial judge, not a jury, makes both the initial and the final decision as to whether a convicted defendant shall live or die. A.R.S. § 13–703; *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Peters v. Kiff*, 407 U.S. 493, 501–02, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (holding that due process requires that jurors be sane and competent in order to validate the fact-finding aspect of a trial). One's legal conscience simply recoils at the shocking thought that the due process clause of the Fourteenth Amendment is satisfied by a judge presiding over a criminal trial and making life or death sentencing decisions while under the influence of, or materially impaired by, the use of an illegal mind-altering substance. Such proceedings before a mentally incompetent judge would be so fundamentally unfair as to violate federal due process under the Constitution. *See Duckett v.*

*Godinez,* 67 F.3d 734, 740 (9th Cir.1995). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

### D.

■ A petitioner whose case is governed by pre-AEDPA jurisprudence—such as Summerlin—is entitled as a matter of law to an evidentiary hearing on a claim of constitutional deprivation if he can meet both parts of a two-prong test. *See Pierce v. Cardwell,* 572 F.2d 1339, 1342 (9th Cir. 1978). First, the petitioner must tender a colorable allegation which, if proved, would entitle him to relief. *See Medina v. Barnes,* 71 F.3d 363, 366 (10th Cir.1995) ("To be entitled to an evidentiary hearing in a federal habeas action, the petitioner must first make allegations which, if proved, would entitle him to relief.").

Second, he must demonstrate that the facts are in dispute, and that through no fault of his own, they were not adequately developed for the record in the state court. *See Pierce,* 572 F.2d at 1342 ("Where the facts are in dispute, the federal court to which a habeas corpus petition is made *must* grant an evidentiary hearing if the merits of the factual dispute were not resolved in a hearing in a state court, either at the time of trial or in a collateral proceeding.") (emphasis added); *see also Townsend,* 372 U.S. at 307–09, 83 S.Ct. 745; *Keeney,* 504 U.S. at 8–9, 112 S.Ct. 1715; *Rhoden v. Rowland,* 10 F.3d 1457, 1460 (9th Cir.1993) (federal evidentiary hearing warranted where petitioner took all steps to develop facts, but state court deprived him of the opportunity to do so).

The Supreme Court has recognized that granting evidentiary hearings to agitated prisoners with little but time on their hands will necessarily create institutional stress and tension, but nevertheless concluded that the "Great Writ" demands, at the least, the airing of the facts. The Court unequivocally delineated the district court's duty in this regard, stating:

> We are aware that confinement sometimes induces fantasy which has its basis in the paranoia of prison rather than in fact. But where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, *it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.* Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the "usages and principles of law."

*Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (emphasis added); *see also* Rules Governing § 2254 Cases Rule 6(a) advisory committee's notes.

In deciding whether an evidentiary hearing is required in connection with a habeas claim, it is useful to remember that "[t]he prosecution against [a criminal defendant] is a criminal prosecution, but the writ of habeas corpus is not a proceeding in that prosecution. On the contrary, it is a new suit brought by him to enforce civil rights." *Ex parte Tom Tong,* 108 U.S. 556, 559–60, 2 S.Ct. 871, 27 L.Ed. 826 (1883). In other words, the habeas process is not part of the appellate process from the state court conviction. It is for this fundamental reason that where success on a constitutional claim requires and depends upon presentation of evidence and the ascertainment of facts outside of the trial record, Congress has made provisions in habeas proceedings for an array of devices designed to develop a factual record,

such as depositions and interrogatories, 28 U.S.C. § 2246, the introduction of documentary evidence, *id.* at § 2247, and finally, the determination of facts at evidentiary hearings.

We find additional guidance on this evidentiary hearing issue in analogous cases decided by the Supreme Court, cases involving allegations of juror partiality or bias. In a holding which seems easily to fit Summerlin's allegation of judicial mental impairment, the Court said that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing at which the defendant has the opportunity to prove actual bias." *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

The *Smith* Court relied on its previous decision in *Remmer v. United States,* 347 U.S. 227, 228, 74 S.Ct. 450, 98 L.Ed. 654 (1954), which ordered an evidentiary hearing where an unnamed person had allegedly told a juror that the juror could "profit by bringing in a verdict favorable to the petitioner." Without notifying the defense, the state trial court sent in during the trial and before the verdict an F.B.I. agent to investigate the juror. *Remmer,* 347 U.S. at 228, 74 S.Ct. 450. Subsequently, the petitioner was convicted. *Id.* The Supreme Court criticized the trial court's unilateral handling of this issue and ordered an inquiry "with all interested parties permitted to participate." *Id.* at 230, 74 S.Ct. 450.

*Smith* quotes extensively from *Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950), another case involving claims of juror bias. Concerning the manner of and importance of ferreting out such a threat to the integrity of the trial process itself, the Court said: "Presentation of *the opportunity* to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Smith,* 455 U.S. at 216,

102 S.Ct. 940 (emphasis added) (quoting *Dennis,* 339 U.S. at 171–72, 70 S.Ct. 519).

Finally, we come to *Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), a case addressing whether a habeas petitioner had demonstrated "good cause" for discovery under Habeas Corpus Rule 6(a) in a matter wherein he alleged that a state judge convicted of bribery in other cases tried around the same time might have behaved improperly in the petitioner's case. Bracy had not bribed the corrupt judge but argued that by not doing so, he might have become the victim of "compensatory bias" in that the corrupt judge might have convicted him simply "to allay suspicion of his pattern of corruption and dishonesty." If so, argued Bracy, he did not get from that judge the fair trial to which he was entitled under the Constitution.

The district court in its discretion denied Bracy's supplemental motion for discovery, a decision affirmed by the Court of Appeals by a divided vote. Notwithstanding the circumstantial and speculative nature of Bracy's showing, the Supreme Court unanimously held that this denial of discovery was an abuse of discretion. The Court said, "In *Harris,* we stated that 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" *Bracy,* 520 U.S. at 908–09, 117 S.Ct. 1793 (quoting *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)).

Two aspects of *Bracy* stand out. First, the conjectural nature of the petitioner's showing. At the point he filed his motion for discovery, all Bracy had to work with was (1) the corrupt judge's behavior in other cases tried around the same time, (2)

the fact that the corrupt judge had appointed one of his former partners to be Bracy's attorney, (3) the involvement of one of the judge's other associates in the bribery scheme, and (4) inferences that might be drawn therefrom. This evidence, although compelling, was entirely circumstantial. In effect, Bracy's showing depended upon a yet unproved but plausible theory.

Second, the Court was obviously troubled by a trial judge's possible misbehavior in exercising his judgment on a basis wholly incompatible with the rule of law and the requirements of a fair trial. One need not read between the lines in *Bracy* to understand that the Court took constitutional umbrage at the possibility of judicial misconduct affecting the outcome of a criminal case and the integrity of the judicial process.

### E.

■ We conclude that Summerlin's specific and uncontroverted factual allegations against Judge Marquardt in the district court amount in the aggregate to a colorable "reason to believe" that this defendant may have been deprived of his constitutional right to a competent tribunal. Accordingly, this showing entitled him both to funds to investigate this matter and to an evidentiary hearing in order to develop the connection, if any, between the judge's chronic use of illegal drugs, his alleged addiction, and his performance during this case as a judge. *See* 28 U.S.C. § 2254(d); *Townsend*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. If it turns out that Summerlin can prove his allegations against Judge Marquardt, then his due process claim will have merit. Given the respondent's concessions about the judge's substance abuse and Barbara Moffett's statement to the effect that Judge Marquardt was using marijuana as early as

1975, six years before the trial, the fact that his addiction did not fully surface publically until 1991 does not alter our conclusion as to the need for a hearing on this issue. Our due process concern is heightened by the fact that Judge Marquardt deliberated and made the key life or death decisions in this case "over the weekend," while not on the bench or in public view. On Friday, July 8, 1982, Judge Marquardt said, "I want you to know that at this time I have made no decision at this time of what I'm going to do in your particular case. That will be over the weekend, after I've heard final argument by both counsel." This Judge Marquardt then did, announcing his death sentence on the following Monday. Thus, because Judge Marquardt deliberated behind closed doors over the weekend, it is distinctly plausible in connection with Summerlin's request for an evidentiary hearing that he did so under the influence of the illegal drug to which by his own admission he became at some point addicted.

As soon as Summerlin became aware of Judge Marquardt's illegal conduct, he made it an issue in a state Rule 32 petition for postconviction relief filed in 1991, which was finally and summarily denied on March 1, 1994. *See* ARIZ. R. CRIM. P. 32. As far as we can tell, the facts surrounding this matter were never fully developed in state court. The record does not suggest and the respondents do not allege that Summerlin bears any responsibility for the missing minor premise needed to complete the syllogism. Summerlin must be allowed to establish a predicate for his claim if his federal constitutional right to a mentally competent tribunal means anything. *See Tanner*, 483 U.S. at 126–27, 107 S.Ct. 2739; *Jordan*, 225 U.S. at 176, 32 S.Ct. 651. As Justice Holmes opined in *Moore v. Dempsey*, 261 U.S. 86,

92, 43 S.Ct. 265, 67 L.Ed. 543 (1923), a United States Judge has a "duty of examining the facts ... when, if true, as alleged, they make the trial absolutely void."

## F.

Our respected colleague in dissent on this issue raises not insubstantial concerns about our decision. He worries first that we are opening the floodgates to literally thousands of prisoners who will now tender the-judge-was-under-the-influence habeas claims against Judge Marquardt and others and seek corresponding evidentiary hearings. He argues that our error in this respect is not that we are wrong about a defendant's right to a mentally competent tribunal, but that we permit this petitioner without an adequate showing of cause to go on a fishing expedition into the "private life" of a judge. Taking our lead from the Supreme Court's opinion in *Bracy*, we respectfully disagree.

First, if Judge Kozinski's speculation about the vulnerable state of the judiciary should surprisingly turn out to be correct and that our benches are indeed occupied by judges against whom similar cases involving illegal drug usage and addiction can be made, this would seem to be an argument in favor of an inquiry, not a reason to look the other way. However, we seriously doubt the inflated assertion that thousands of state and federal judges will somehow fall within the ultraviolet rays cast by our holding. Our combined experience simply tells us that this is not the case, Judge Kozinski's extrapolations notwithstanding. After all, *Jordan* has been on the books since 1912 without fomenting a frenzy of litigation.

Second, our colleague claims we are ordering what amounts to "rummaging" through Judge Marquardt's "private life," and that we are unfairly condemning him to a future spent in "small, poorly lit rooms, giving depositions about whether or not he was smoking pot in his off-hours...." Although we do share Judge Kozinski's concern about unsupported fishing expeditions, we are not persuaded that this is what Judge Marquardt faces in this case. Other possible cases involving Judge Marquardt, if any, will have to be decided on the facts and circumstances of those cases.

Moreover, even though Judge Marquardt may have deliberated and made his sentencing decision at home, we do not believe that this legal decision-making process can be regarded or sealed off as his "private life." Judge Marquardt's brazen use of his Superior Court address and official title "judge" in connection with his purchase of marijuana from Barbara Moffett certainly suggest that he did not draw the compartmentalized distinction urged by Judge Kozinski. No matter where he undertook it, the deliberative process in question was undoubtedly part of his public responsibilities as a judge, and where he performed it is of no moment. Whether he arrived at the decision in chambers or at home is irrelevant to the core question of his mental condition at the time.

In the main, we trust that with the evidentiary rules requiring relevancy, the district court will be able in the exercise of its discretion to keep this hearing focused on the judge's performance of his official duties in connection with this trial and this sentence. This said, we respectfully disagree with Judge Kozinski's assertion that we are unleashing the furies upon our justice system. We do not contemplate, nor should the district court allow, a free-for-all foray into Judge Marquardt's truly private behavior.

What this matter boils down to is a difference of informed opinions as to the showing that Summerlin has made regard-

ing the need for an evidentiary hearing. Judge Kozinski believes the showing is deficient. Informed by *Jordan, Tanner, Taliaferro,* and *Bracy* we do not. Although the seriousness of Judge Marquardt's problem was not discovered until seven years after Summerlin's trial, Barbara Moffett's information that he was a "frequent user" six years before the trial combined with the Judge Marquardt's admission of addiction provide ample "reasonable grounds," *Sullivan v. Fogg,* 613 F.2d 465, 467 (2d Cir.1980), to look into the "entire picture." *Remmer v. United States,* 350 U.S. 377, 379, 76 S.Ct. 425, 100 L.Ed. 435 (1956). Given his record, Judge Marquardt cannot be heard to complain that his longstanding illegal behavior should come under scrutiny with respect to his official duties as a judge.

One way to check whether we are on track on this issue is to ask what the Constitution would require if it were to be found on the basis of substantial evidence, for example, that Judge Marquardt was using and under the influence of or mentally impaired by marijuana when he evaluated the sentencing aspect of the case and decided that Summerlin must die. Confronted with such a scenario, we do not hesitate to declare that Summerlin would not have received a fair trial on this issue. Accordingly, we are comfortable on these facts with ordering an evidentiary hearing to determine whether this is in fact the case. On the other hand, if the district court should determine that Judge Marquardt was unimpaired and clear-headed, the foul air surrounding this death sentence will have been cleared.

Alexander Hamilton described our independent judiciary as "the citadel of the public justice and the public security," calling judges the "guardians of the Constitution." THE FEDERALIST No. 78 (Alexander Hamilton). This pivotal role was also described by Hamilton in that seminal work as the "least dangerous to the political rights of the Constitution" because it has "no influence over either the sword or the purse ..." *Id.* But, if judges are bereft of those normal sources of governmental power, what do they have at their disposal "to secure a steady, upright, and impartial administration of the law?" *Id.* "Judgment," said Hamilton, "merely judgment...." *Id.*

The experts tell us that we can tolerate a certain number of insignificant parts of arsenic in our drinking water and a certain irreducible number of insect parts in our edible grain supplies, but we need not, and we should not, similarly tolerate a single drug addicted jurist whose judgment is impaired, especially in a case involving life and death decisions. Neither should we put to death any prisoner so condemned by such a wayward judge.

It is difficult to gainsay the importance of enforcing with efficient and sensible sanctions the core due process guarantees in our Constitution. To look the other way in the face of certain serious constitutional deficiencies is to render those guarantees "'a form of words,' valueless and undeserving of mention in a perpetual charter of inestimable human liberties." *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Frequently, we do use the doctrine of harmless error with respect to a wide spectrum of constitutional failures, but not such a fault involving the performance of a judge who was demonstrably not impartial. *See Arizona v. Fulminante,* 499 U.S. 279, 306–311, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Supreme Court has labeled this kind of systemic defect "structural error" and rendered it categorically immune from harmless error analysis. *Id.* at 309–10, 111 S.Ct. 1246; *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). The

reason for regarding this level of constitutional failure as "structural" is obvious: impartiality is the *sine qua non* of judging. Bias or favoritism is utterly irreconcilable with and necessarily perverts the judicial function. The rule of law which provides the framework for our system of justice is thwarted by a judge marching to an unauthorized drummer.

Is the problem materially different if the failure of the judge properly to exercise his judgment stems from the influence of illegal drugs rather than the influence of illegal money? We think not. In both cases, the litigant is deprived of the untainted judgment to which he is entitled by our Constitution. In this respect, we agree with our dissenting colleague that "corruption (a species of bias) and incapacity are cut from the same cloth ...," but we do note an important difference: a corrupt judge has a choice; by definition, an addict driven by compulsion does not. An addict is an addict 24 hours a day, seven days a week.

We pause here to explain what we are *not* holding. This opinion does not mean that any speculative claim spun by a petitioner is enough to trigger funds for discovery or for an evidentiary hearing regarding the mental competency of a trial judge. A petitioner asking for such must be able by way of "specific allegations" to demonstrate a "reason to believe" that "if the facts are fully developed" he will be able to demonstrate that he is "confined illegally and is therefore entitled to relief...." We trust that district court judges will be able to use this test to know when to say "yes," and when to say "no."

Furthermore, and not surprisingly, this case is fact specific. It is not about prescription drugs or painkillers or a jurist grieving about the loss of a child. It is about uncontroverted allegations of illegal drug use, of crimes, and of addiction to an illegal mind-altering substance, one that distorts perceptions and degrades judgment. In the vernacular, it is a substance that with chronic abuse renders smart people average and average people stupid. If it is against the law to drive a vehicle under the influence of marijuana, surely it must be at least equally offensive to allow a judge in a similar condition to preside over a capital trial.

The Constitution may not entitle everyone to the wisdom of Solomon, but it does at a minimum entitle everyone to judicial judgment not impaired by mind-altering illegal drugs. We see no cause to be concerned about the stability of the justice system by pausing here to make sure that the Constitution has been respected and that the State will not take life without due process of law. "What was true two centuries ago is true today: 'Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges.'" *United States v. Microsoft*, 253 F.3d 34, 115 (D.C.Cir. 2001) (quoting CODE OF CONDUCT FOR UNITED STATES JUDGES CANON 1).

## VI

### *APPRENDI CLAIM*

Summerlin's *Apprendi* claim that he was entitled to have a jury determine the elements required for a death sentence is foreclosed by *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), in which this same issue was raised and decided. Until the Supreme Court decides otherwise, which it has not as of this opinion, we are bound to follow its precedent. As we recently stated in *Hoffman v. Arave*, when presented with the same claim: "[W]hile *Apprendi* may raise some doubt about *Walton*, it is not our place to engage in anticipatory overruling.

The Supreme Court has specifically directed lower courts to 'leav[e] to this Court the prerogative of overruling its own decisions.'" 236 F.3d 523, 542 (9th Cir.2001) (citing *Agostini v. Felton,* 521 U.S. 203, 207, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). Thus, we reject this ground he asserts in support of his petition.

## VII

### *RELIEF*

This case is remanded to the district court for further proceedings in connection with Summerlin's entitlement to an evidentiary hearing on the relevant mental competency of Judge Philip Marquardt. In all other respects, the judgment of the district court is affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED.

KOZINSKI, Circuit Judge, dissenting in part:

My colleagues take a giant leap into the unknown by ordering discovery and a hearing as to whether Judge Marquardt's marijuana addiction affected his rulings in Summerlin's trial and sentencing. The opinion points to nothing in the trial record suggesting that Judge Marquardt was incoherent or intoxicated,[1] nor did anyone present at the trial report that the judge acted inappropriately. In fact, there is no proof whatever that Judge Marquardt's purported marijuana addiction affected his performance in Summerlin's case. By allowing Summerlin to proceed with his claim based on this paper-thin showing, the majority's ruling will cause major upheaval in the administration of the criminal laws in all states within the Ninth Circuit.

I agree that a criminal defendant is entitled to a tribunal that is both impartial and mentally competent. *See* Maj. Op. at 948 (citing *Jordan v. Massachusetts,* 225 U.S. 167, 168, 32 S.Ct. 651, 56 L.Ed. 1038 (1912)). While both *Jordan* and *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) involved juries, their teachings can be applied to judges as well. The majority and I part company as to the showing a criminal defendant must make before he will be allowed to rummage through a judge's private life, looking for proof that the judge's addiction, illness or other mental impairment may have affected his judgment. In my view, Summerlin does not come close to making the necessary showing, and the majority's opinion will open the floodgates to similar claims by—quite literally—tens of thousands of state and federal prisoners within this circuit.

I start with the presumption that "public officials have properly discharged their official duties." *Bracy v. Gramley,* 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (internal quotations and citation omitted)). A prisoner can rebut that presumption but, as the Supreme Court held in *Bracy,* only through specific proof that the impropriety in question had an effect in *"petitioner's own case." Id.* at 909, 117 S.Ct. 1793. *Bracy* was not a case about judicial impairment; it was about corruption. But corruption (a species of bias) and incapacity are cut from the same cloth, and thus *Bracy*'s teachings are applicable to our case. (In fact, for reasons I explain below, a claim of judicial incapacity presents serious issues that a claim of

---

**1.** Petitioner in his brief does cite what he claims are instances of confusion on the trial judge's part, but none of them is terribly persuasive. *See* Appellant's Brief at 37–41.

At most, they seem to be the kind of slips of the tongue, misunderstandings or transcription errors that one finds in any trial transcript.

corruption does not, so the former must be treated with even more circumspection than the latter.)

Bracy was convicted and sentenced to death in a case presided over by Judge Maloney, who was later convicted of fixing criminal trials as part of a widespread federal corruption probe of state trial judges in Chicago. Judge Maloney did not take a bribe in Bracy's case, but Bracy claimed that Maloney may have engaged in compensating bias by being harsh on non-bribing defendants to cover his leniency to defendants who did pay bribes. In support of his claim, Bracy presented the following evidence: His murder trial "was sandwiched tightly between other murder trials that Maloney fixed." *Id.* at 907, 117 S.Ct. 1793. Moreover, Maloney had appointed one of his former partners as Bracy's counsel, and Bracy introduced evidence that at least one of Maloney's former associates "was actively involved in assisting Maloney's corruption, both before and after [Maloney] became a judge, and also bribed Maloney himself." *Id.* Bracy's theory was that Maloney had appointed his former partner so that Maloney could be sure Bracy's lawyer "would not object to, or interfere with, a prompt trial, so that [Bracy's] case could be tried before, and camouflage the bribe negotiations in," another murder case. *Id.* at 908, 117 S.Ct. 1793. And indeed, Bracy's attorney declared himself ready for trial very quickly and did not ask for additional time even after the state announced that "if petition-

er were convicted, it would introduce petitioner's then-pending Arizona murder charges as evidence in aggravation." *Id.* at 907–08, 117 S.Ct. 1793.

The Supreme Court held that Bracy's showing was sufficient to entitle him to discovery on his compensatory bias theory. In doing so, however, the Court made it abundantly clear that it was not authorizing similar relief to every criminal defendant who had been convicted or sentenced by Judge Maloney: "We emphasize ... that petitioner supports his discovery request by pointing not only to Maloney's conviction for bribe taking in other cases, but also to additional evidence, discussed above, that lends support to his claim that Maloney was actually biased *in petitioner's own case.*" *Id.* at 909, 117 S.Ct. 1793. And, indeed, in the post-*Bracy* case of *United States ex rel. Dower v. O'Sullivan,* No. 98 C 2415, 1999 WL 98340, at *4 (N.D.Ill. Feb.19, 1999), involving another individual convicted in a trial presided over by Judge Maloney, Judge Shadur held that the petitioner was not entitled to relief because he had not made a showing of compensating bias in his particular case.

Summerlin's case is much more like Dower's than Bracy's. The majority cites not a single fact suggesting that Judge Marquardt was under the influence of marijuana during Summerlin's trial. Rather, the majority relies on evidence that, nearly a decade after Summerlin's trial, Judge Marquardt admitted to being addicted to marijuana.[2] We have no indi-

---

**2.** Pleas of addiction are quite common in seeking leniency from a sentencing court. Without being unduly skeptical, I note that we have only Judge Marquardt's word for it; Summerlin did not introduce expert evidence supporting Judge Marquardt's claim of addiction. We don't even have a sworn statement from Judge Marquardt himself, only his probation officer's characterization of Judge Marquardt's unsworn oral statements.

While I would be prepared to believe an expert if he testified that Judge Marquardt was addicted—or perhaps even Judge Marquardt himself—the factual showing here seems to consist of nothing one might consider admissible evidence. If we're going to accept a hearsay report of Judge Marquardt's unsworn statement that he was addicted to marijuana, why don't we also accept another

cation, even as of the time of Judge Marquardt's conviction, whether this addiction involved hourly, daily or weekly use of the drug, nor do we know whether it had become progressively worse over the years. There is nothing to suggest that the addiction affected Marquardt's judgment or interfered in any way with his judicial duties. Being addicted, after all, means that one must use a substance on a regular basis; it doesn't mean that one is in a constant state of intoxication. Many addicts function normally in their professional lives, performing their jobs well enough so that their coworkers suspect no problem. *See* 3 Dan J. Tennenhouse, *Attorneys Medical Deskbook 3d* § 23:34, at 23–88 (1993). We have no indication that Judge Marquardt's addiction played any role in Summerlin's trial, or during the time he deliberated about Summerlin's sentence.

The majority misreads *Bracy* by stressing the conjectural nature of the claim presented there. Maj. Op. at 952–53. Merely presenting a conjectural claim cannot be sufficient to obtain discovery and a hearing under *Bracy*, else every prisoner with a conjectural claim would be entitled to similar relief. At the very least, petitioner must show that he has marshaled all the facts reasonably available to him without discovery. *See Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir.1999). Summerlin has not come close to doing this. For example, Summerlin and the majority rely on a statement allegedly made by drug dealer Barbara Moffett that Judge Marquardt used marijuana since the seventies.

But the statement in question does not come from Moffett herself, nor is it under oath. Rather, it comes from a police report of an interview with Moffett in 1991. In order to give credence to this double hearsay, we have to assume that Moffett was telling the truth, and that the officer reported her statement accurately. Summerlin's lawyers made no effort to contact Moffett or the officer who wrote the report. Nor did they claim that their efforts to obtain such statements were thwarted by lack of cooperation or inability to find these witnesses. Unlike *Bracy*, then, where petitioner presented as much proof as could reasonably be expected in support of his theory, Summerlin comes nowhere close to making the kind of showing that would justify discovery and an evidentiary hearing.

The majority's ruling is particularly unfortunate because Summerlin is in precisely the same position as every other criminal defendant tried, convicted and sentenced in Judge Marquardt's courtroom during the latter's twenty-year judicial career. Under the majority's ruling, every one of these individuals—and there are no doubt hundreds of them—could petition to have their sentences set aside based on the same flimsy showing. While not all may succeed, all will at least be entitled to discovery and a hearing on the point. This is exactly the result the Supreme Court sought to avoid in *Bracy* when it held that the petitioner must make a showing of corruption "*in [his] own case.*" *Bracy*, 520 U.S. at 909, 117 S.Ct. 1793.

hearsay report of his unsworn statement that he was never intoxicated while on the bench or while otherwise performing his judicial duties? *See* Glen Creno, *Marquardt Says Drug Use Never Affected Work as Judge*, Phoenix Gazette, June 8, 1991, at B1 ("I've never been on the bench impaired ... I never was on the job under the influence of a drug.").

It seems strange that the State of Arizona, which was Judge Marquardt's adversary in the case where he is supposed to have made his claim of addiction, gets stuck with what is essentially a finding that he was addicted, where that finding is not even supported by admissible evidence.

Summerlin could have made such a showing here if he really had anything to complain about. He might have offered an affidavit from Moffett or the police officer who wrote the report of her statement. He might have presented affidavits from those who observed the trial, to the effect that Judge Marquardt was seen staggering when mounting or leaving the bench; that he had a glazed stare during the proceedings; that he had trouble comprehending arguments; that he fell asleep in court; that he was confused and discombobulated; that he made inappropriate comments; that he appeared disconnected from reality; that the scent of burning marijuana was detected coming from his office; that marijuana residue was found in his wastecan; that he was seen stumbling through the corridors of the courthouse; that his eyes appeared red and watery; that he had a hard time focusing his attention—and scores of similar telltale signs of intoxication.

A trial judge, after all, is on public display for hours at a time, day after working day. His job requires him to interact with parties in a highly charged environment that taxes the resources of even the strongest and ablest among us. It is inconceivable that Judge Marquardt took the bench under the influence of drugs and no one noticed—not a party, not a lawyer, not a witness, not a bailiff, not a juror, not a spectator. Remarkably, neither Summerlin, nor his trial lawyer, nor any other member of the trial defense team, submitted declarations claiming that they observed Judge Marquardt behaving inappropriately. The majority nevertheless holds that petitioner has made a prima facie case that he was denied a competent adjudicator without any showing that the judge was impaired in his particular case—precisely the result the Supreme Court took pains to avoid in *Bracy*.

All of this presupposes that the *Bracy* standard, developed to deal with claims of judicial corruption, is directly applicable to a case like ours. In fact, claims of mental impairment pose very different problems than claims of corruption, and it is therefore appropriate to put a much heavier burden on a petitioner claiming his judge suffered from mental impairment. Corruption is a mercifully rare event in our judicial system; it is a crime that cuts to the very heart of our judicial process and, of necessity, undermines its legitimacy. There is no excuse or justification for corruption; corruption is not a personal matter as to which a judge has a legitimate expectation of privacy.

Mental impairment—whether as a result of illness, injury, old age, family tragedy or substance abuse—is, unfortunately, the stuff of life. Judges, like other human beings, may on occasion have one too many drinks, or even become alcoholics. They may be prescribed pain killers to which they become habituated, or they may become dependent on sleeping pills. It would not be surprising to learn that some judges, like many others in our society, take Prozac or other mood-altering drugs.[3] Judges get sick; they get senile; they get depressed; they suffer temporary or permanent mental impairments due to age or tragic events in their lives. All of these circumstances, of course, have the potential of impairing their judgment, but they also have an intensely personal and private aspect to them.

Unlike corruption—which is inherently and irreconcilably at war with the judicial function and gives rise to no legitimate

---

**3.** Strictly speaking, Prozac and similar drugs are designed to affect only the mood, not the mental processes of the patient. *See* Eli Lilly & Co., *Prozac, in Physicians' Desk Reference* 1127 (55th ed.2001). But, as we know, moods often affect mental processes.

expectation of privacy—judges rightly expect to have medical histories, family tragedies, even occasional overindulgences in intoxicating substances, remain private. Unless there is a substantial showing that the judge acted improperly while presiding in a particular case, we should provide no incentive for parties to go digging into a judge's private life looking for proof of mental impairment. *See, e.g., United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir.1996) (petitioners failed to demonstrate the existence of any extraordinary circumstances that would warrant discovery into a judge's mental health).

The majority seems proof to such concerns, as it encourages the most sweeping inquiry into Judge Marquardt's private life based on the flimsiest showing. With no indication whatever that Judge Marquardt was impaired during Summerlin's trial, or during his deliberation about Summerlin's sentence, the majority opens up a factual inquiry that is breathtaking in its scope. Not only will Summerlin be entitled to scrutinize Judge Marquardt's conduct on the bench, the majority makes it clear that he may inquire into marijuana use over the weekend preceding the imposition of sentence. This is because the judge happens to have indicated that he would think about the case over that weekend. *See* Maj. Op. at 949. Of course, as my colleagues know, judges think about their cases at all odd hours. There is no reason to believe that Judge Marquardt thought about Summerlin's case only during that one weekend. He might have thought about it every weekend that Summerlin's case was before him, and every evening too. Under the majority's rationale, all of

Judge Marquardt's personal time during Summerlin's trial would be fair game for inquiry.

But it gets worse. The majority does not even limit the factual inquiry to the period surrounding Summerlin's trial. Rather, the majority holds that Judge Marquardt's actions involving the purchase of marijuana nine years after the Summerlin trial is also a proper subject of the inquiry. *See* Maj. Op. at 954. The majority apparently considers this incident relevant to Summerlin because it involves one instance of bizarre behavior that may have been motivated by Judge Marquardt's marijuana addiction. But this happens to be the one incident we know about. By the same logic, Summerlin should be able to probe into other instances of unusual behavior that might have been caused by Judge Marquardt's substance abuse over the years. And, as noted above, Summerlin will not be the only one who is entitled to make this inquiry; every other defendant who appeared before Judge Marquardt will too. Poor Judge Marquardt will spend the rest of his days in small, poorly lit rooms, giving depositions about whether or not he was smoking pot in his off-hours, while thinking about this or that or the other case that happened to be on his docket at a particular time.

Nor will he be alone, because what goes for Judge Marquardt goes for many of the 4,000 judges in this circuit who are involved in administration of the criminal laws.[4] While the vast majority of these judges have not been convicted of drug abuse, some will have been subject to some

---

4. This figure includes 313 federal circuit, district and magistrate judges, and 3,753 state court judges (not including judges from Guam, the Northern Mariana Islands or tribal courts). Yet the number is no doubt much larger, because this figure represents only those judges now involved in the administration of the criminal laws. The majority's reasoning would extend the population to include those judges who have imposed criminal punishment in the past 20 or 30 years, but are no longer on the bench.

other mental impairment that, arguably, should call their judgment into question. While the majority tries to narrow the scope of its ruling by speaking of impairment resulting from (1) addiction to an (2) illegal (3) substance, none of these provides a meaningful limitation. If a judge is substance impaired while performing judicial functions, it is of no consequence to the parties if the substance is illegal, like marijuana, or legal, like alcohol or a prescription drug; as a matter of due process, what matters is the impairment, not whether it was achieved by legal or illegal means. That was the teaching of *Tanner*, which involved a claim based, in part, on alcohol abuse.

Equally irrelevant is the matter of addiction. If a decisionmaker exercises judicial powers while substance impaired, the parties have been denied due process, whether that impairment was the result of addiction or a one-time binge. In *Tanner*, the issue was whether the jurors were using alcohol and/or drugs during breaks in the deliberations, not whether they were compelled to do so by addiction.

Finally, *Jordan*, on which the majority also relies, holds that having a decisionmaker who suffers from impairment due to mental illness can violate due process. Thus, the fact that we are dealing here with a mental impairment due to substance abuse—rather than illness—also provides no meaningful limitation. Indeed, according to a widely held view, substance addiction *is* a form of illness—an illness that forces the individual to turn to one substance or another in order to satisfy an uncontrollable internal craving.[5] One need not accept the view that substance addiction is a pathology in order to recognize that different people have different susceptibilities to alcohol and other drugs. At the same time, it is entirely possible for individuals to be alcoholics or otherwise substance-addicted, yet function normally in their professional lives. *See* pp. 958–59 *supra*. Senility, dementia and other mental impairments are much harder to compartmentalize. If a judge manifests symptoms of mental impairment in his private life, this is much more likely to signify impairment in his professional life as well; thus, the case for challenging a judge's rulings because he has demonstrated mental disability in some aspect of his life unrelated to his work is far stronger than in our case. *See Washington*, 98 F.3d at 1166 (Kozinski, J., concurring).

The incentives today's ruling creates for digging into the private lives of judges with shovels and pick-axes cannot be overstated. Of course, any judge who is disciplined for substance abuse or for driving under the influence of alcohol will be fair game for an inquiry; the number of judges involved is not trivial.[6] So, too, would judges like Judge Boldt of Seattle who, late in their lives, or perhaps even after their deaths, are revealed to have had a debilitating mental impairment, but were never disciplined or barred from hearing

---

5. That seems to have been Judge Marquardt's situation, at least according to his account of the matter. He apparently started out as an alcoholic but eventually managed to substitute marijuana addiction for alcoholism. *See* Probation Report of Philip W. Marquardt at 5 (Sept. 18, 1991).

6. In California alone there were 11 state judges disciplined for substance abuse, alcohol abuse or other mental incapacity for the ten-year period 1990–2000. *See* California Comm'n on Judicial Performance, *Annual Reports 1990–2000*. While figures are not available for all the states in our circuit, adding Arizona and Washington doubles the figure to 22. If we were to roll the numbers back to the date of Summerlin's trial, the number might double yet again. If each of those judges had, say, 1,000 criminal cases during his career, we're talking some real numbers.

cases. *See* Paul Shukovsky, *Alzheimer's Strikes Indians Through Judge*, Seattle Post–Intelligencer, June 11, 1992, at A1. After all, if defendants convicted or sentenced in Judge Marquardt's court while he was subject to marijuana addiction get a hearing on his competency, how could we withhold a similar hearing from defendants that Judge Boldt may have convicted and sentenced while suffering from Alzheimer's?

And what justification is there for limiting the inquiry to judges whose mental impairments happen to become public? If suspected mental impairment is a legitimate basis for challenging a judge's rulings, then surely parties will be justified in prying into the private lives of judges to see whether they are or have been subject to mental impairment. The normal tools of factual investigation—from searches of electronic databases to private detectives-will be employed by lawyers eager to learn whether the judges who preside over their clients' criminal cases might have been observed at parties dancing with lampshades on their heads.[7] Quite aside from the intrusion this will cause into the private lives of judges, the destabilizing effect it will have on criminal convictions long thought to be final is alarming.

The majority dismisses these concerns by suggesting that judges seldom have the kinds of personal problems that will make an inquiry worthwhile. *See* Maj. Op. at 954. This misses the point entirely: The danger in the majority's ruling is not merely that some prisoners might be able to show that their judges were mentally impaired; it is also that it gives prisoners a strong incentive for probing into the private lives of all judges in the hope of finding some dirt they can parlay into a *Bracy* hearing. Even if the prisoners find nothing, as would doubtless be true in most cases, the judges will have suffered an unwarranted invasion into their privacy. The danger is not, as the majority seems to think, limited to the few judges who are impaired, but extends to all judges in our circuit who handle criminal cases.

The opinion suffers from yet another fatal flaw: While my colleagues wave their magic wand in the general direction of Judge Marquardt and order that a hearing be held, they don't explain what the judge holding the hearing is to look for. In *Jordan* and *Tanner* the inquiry regarded objective facts, not the mental processes of the decisionmaker. *Tanner* noted that Federal Rule of Evidence 606(b) prohibited such an inquiry, but did not preclude observations of third parties or other objectively verifiable evidence of mental impairment in the jury room. A similar rule protects the mental processes of judges. *See Fayerweather v. Ritch*, 195 U.S. 276, 307, 25 S.Ct. 58, 49 L.Ed. 193 (1904); *Washington v. Strickland*, 693 F.2d 1243, 1262–63 (5th Cir. Unit B .1982), *rev'd on other grounds*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When the inquiry is limited to the judge's impairment while on the bench, it's at least theoretically possible that objective evidence can provide an answer; for example, the judge staggered to the bench, his speech

---

**7.** Indeed, why limit it to those who can afford to hire investigators and conduct Internet searches? If mental impairment—without any indication that it has impaired the judge's performance in any way—becomes a basis for setting aside criminal (and what about civil?) judgments, then judges should not be able to play cat and mouse with the litigants by hiding behind a screen of privacy. Just as we are now required to file financial disclosure forms (to guard against corruption), so should we be required to file mental disclosure forms, listing all illnesses, drugs, alcohol, medical procedures and other factors that might bear on our lucidity. Welcome to the fishbowl.

was slurred, his cheeks were flushed and his eyes were red.

But how does one conduct that inquiry into conduct occurring when the judge is not on the bench? Let's say Summerlin is able to show that Judge Marquardt smoked marijuana Saturday night and Sunday afternoon of the weekend when he said he was thinking about what sentence to impose. What then? Presumably Judge Marquardt did not spend every minute that weekend pondering Summerlin's fate. How would a trier of fact be able to determine whether Judge Marquardt did his deliberating only while sober or also while under the influence of marijuana? [8] Isn't this precisely the kind of inquiry that the rule against looking into the mental processes of the judge is meant to preclude?

Judge Marquardt spent two decades on the bench. Except for the two incidents involving marijuana, he had an unblemished judicial record, see In re Marquardt, 161 Ariz. 206, 778 P.2d 241, 247 (Ariz.1989) (in banc); he "served with distinction," id. at 242; he was affirmed over ninety percent of the time (considerably better than we, I might note), id. at 257 (Claborne, J., concurring). "A review of the written criminal appeals reflects sentences that were firm, and which clearly protected society and the victim. They were also just. His civil appeals reflected knowledge of the law and reasoned deliberation and fairness." Id. Judge C. Kimball Rose, the presiding judge of the court on which Judge Marquardt sat, stated that he was not aware of any situation where Judge Marquardt handled his cases inappropriately. See Probation Report of Philip W.

Marquardt at 6 (Sept. 18, 1991). Nothing Summerlin has presented, and nothing the majority says in its opinion, suggests even remotely that Judge Marquardt's private problem had any effect on his handling of Summerlin's case (or any other case). The majority's conclusion that Summerlin's lawyers are entitled to go on a fishing expedition through Judge Marquardt's private life is a tragedy for Marquardt and a disaster for the administration of justice in the nine western states.

I soberly dissent.

THOMAS, Circuit Judge, concurring in part, dissenting in part:

I concur with all but IV(D) of the well-reasoned majority opinion. However, because Summerlin's attorney was constitutionally ineffective during the penalty phase of Summerlin's trial, I respectfully dissent from that section.

Arizona law mandates the death penalty when the defendant has a qualifying prior conviction if there is no mitigating evidence. Ariz.Rev.Stat. § 13–703. Although Summerlin only had one prior conviction, it qualified as a "dangerous felony." Without mitigating evidence, a death sentence was assured, and that is precisely what occurred.

Counsel not only failed to investigate and develop potentially mitigating evidence, but he also failed to present what little mitigating evidence he had assembled. Thus, Counsel's omissions practically guaranteed Summerlin a death sentence. See Evans v. Lewis, 855 F.2d 631, 636–37 (9th Cir.1988) (noting that in Arizona once an aggravating circumstance, like a prior aggravated felony, was found,

---

8. Indeed, even if Judge Marquardt did think about Summerlin under the influence of marijuana, it's not clear why this would taint his decision. Does having a fleeting thought on a subject while intoxicated then vitiate all of the judge's sober deliberations? Or is the test whether the judge actually made up his mind while under the influence? How would one know?

death was inevitable without mitigating evidence, and thus holding that the failure to pursue psychiatric evidence constituted prejudicially deficient performance).

Counsel did not speak to Summerlin even *once* during the one month between guilt and sentencing and apparently did almost no preparation. Counsel knew that the prosecution planned to call two psychiatric experts at sentencing, but he failed to interview them prior to the hearing. Counsel also knew that Summerlin had been convicted of only one dangerous felony—an aggravated assault that counsel tried before another judge. Despite knowing of mitigating circumstances surrounding that assault, including that the victim was not physically harmed and that Summerlin's reaction was in response to the victim striking his wife with her car, counsel did not present this information to the judge. Finally, counsel knew from a psychiatric report that Summerlin had an abusive and violent childhood. He apparently did no investigation into the abuse, and he prepared no witnesses on Summerlin's childhood.

"[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995); *see also Wallace v. Stewart,* 184 F.3d 1112, 1115–16 (9th Cir.1999) (holding ineffective an attorney who spent just over two hours total interviewing potential witnesses, including just over thirty minutes with a psychiatric expert, and failed to contact known and willing witnesses); *Correll v. Stewart,* 137 F.3d 1404, 1412 (9th Cir.1998) (finding counsel's performance deficient when the attorney only met with the defendant for five minutes between the guilt and penalty

phases and failed to call any mitigation witnesses despite knowing people who were willing to testify, and barely raised the defendant's psychiatric history as a mitigating factor).

The majority views Summerlin's statement at the sentencing hearing that he did not want Dr. Tatro to testify as dispositive. To be sure, the defendant "has the ultimate authority to make certain fundamental decisions regarding his case." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). However, "the lawyer has—and must have—full authority to manage the conduct of the trial." *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Further, and perhaps more importantly, if a defendant elects to waive the presentation of mitigating evidence at capital sentencing, it must be an informed choice. *Cf. Anderson v. Calderon,* 232 F.3d 1053, 1085 (9th Cir. 2000) ("Counsel's actions are usually based, quite properly, on *informed* strategic choices made by the defendant and on information supplied by the defendant . . . .") (emphasis supplied). Indeed, because Arizona law mandated a penalty of death in this situation without the presentation of mitigating evidence, a competency hearing would have been required if Summerlin had stated he was knowingly withdrawing the presentation of any defense at sentencing. *See Rees v. Peyton,* 384 U.S. 312, 313–14, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). However, despite the gravity of the consequences, counsel did not explain his strategy—or the consequences of failing to present the mitigating evidence—prior to the hearing, and only spent five minutes with Summerlin at the hearing discussing the matter. Summerlin was not presented with an informed choice and, in any event, Summerlin's attorney had the responsibility to manage the evidentiary hearing.

The majority also reasons that reference to the material in the pre-sentence report sufficed. However, viewing the report out of the context of Summerlin's social history and mental health was not effective assistance. *Cf. Wallace*, 184 F.3d at 1116 (holding that the attorney had been ineffective at sentencing because "[t]he sentencing judge saw only glimmers of this history, and received no evidence about its significance vis-a-vis mitigating circumstances"). Indeed, it may have done more damage than good. The introduction of a pre-sentence report prepared by the government hardly excuses an utter failure to develop any other mitigating evidence or to spend any time preparing for the capital sentencing hearing. The fact that substantial mitigating evidence existed underscores the prejudice suffered by Summerlin by his attorney's failure.

The brutal crime Summerlin committed was heinous and outside the bounds of all decent human behavior. However, it is equally clear that Summerlin is an extremely disturbed individual who did not awaken that morning with the plan of murdering Brenna Bailey. Given the amount of potentially mitigating evidence available, we should not now be left with the substantial question as to whether a death sentence would have been imposed had Summerlin's attorney bothered to investigate and present a sentencing defense. Perhaps, as the majority concludes, presentation of mitigating evidence would not have made any difference. But these are not matters we should leave to idle speculation. Thus, if we were not reversing based on the other issues presented, I would vacate the death sentence and remand with instructions to order a new capital sentencing hearing.